COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Beales, Malveaux and Frucci


ALBERT LAVAL WATSON

                                            MEMORANDUM OPINION[*]

v.      Record No. 1853-24-1                        PER CURIAM
                                                FEBRUARY 3, 2026

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
James C. Lewis, Judge

(Robert W. Williams, Jr., Assistant Public Defender; Office of the
Public Defender, on brief), for appellant. Appellant submitting on
brief.

(Jason S. Miyares,[1] Attorney General; Shelly R. James, Senior
Assistant Attorney General, on brief), for appellee.


Following a bench trial, the Circuit Court of the City of Virginia Beach convicted Albert

Laval Watson of statutory burglary and grand larceny and sentenced him to a total of 40 years of

incarceration with 30 years suspended. On appeal, Watson challenges the sufficiency of the

evidence to sustain his convictions. He also contends that the circuit court abused its sentencing

discretion. For the following reasons, we affirm the circuit court's judgment.[2]

BACKGROUND

On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth."

*Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v.*

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] After examining the briefs and record in this case, the panel unanimously holds that oral argument is unnecessary because "the appeal is wholly without merit." Code § 17.1-403(ii)(a); Rule 5A:27(a). In addition, appellant has waived oral argument in this case.

*Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

In October 2022, L.C. lived in an apartment in Virginia Beach.[3] She traveled out of town on October 20, 2022. L.C. believed that she locked her front door—which opened to an outside breezeway—because she did so "pretty consistent[ly]." But she could not confirm that she did so when she left for her trip. She also possibly left the sliding glass door to her second-floor balcony unlocked. When L.C. returned home on the morning of October 23, 2022, her apartment had been "completely tossed" and her belongings were strewn about everywhere. L.C. had not given anyone permission to enter her residence while she was gone. She immediately called the police.

L.C. discovered that multiple items were missing from her apartment, including: a 55-inch TV from the living room; a 32-inch TV from the bedroom; a pearl necklace and multiple other necklaces; a Michael Kors purse; and two smaller Coach purses. L.C. testified that she had owned the 55-inch TV for 6 years, and "at the time of purchase," its value was $600 to $700.[4] She assessed the value of that TV as $400 at the time of the theft because it was in very good condition.

At trial, L.C. testified that the 32-inch TV was worth $100. She stated that her grandmother had given her the pearl necklace ten years earlier as a graduation present. She did not know the purchase price but believed that it was worth $200. The thief also took approximately 15 other necklaces that L.C. described as "day-to-day jewelry" and of "generic store value." She assessed the combined value of those pieces as $50. L.C. averred that her grandmother gave her the Michael

---

[3] We use initials, rather than names, to protect the privacy of the victim.

[4] On cross-examination, L.C. clarified that she had won the 55-inch TV as a prize.

- 2 -

Kors bag as a gift three years earlier and that the two Coach purses were approximately seven years old. She concluded that the bag and two purses had a collective value of $400.

In a photograph of her bedroom taken after the burglary, L.C. identified a portable lockbox that she found open on the bedroom floor. She purchased the lockbox in Midlothian, Virginia, in 2012.[5] A police technician lifted several potentially useable fingerprints from the lockbox. Subsequent analysis determined that one of those prints "matche[d]" Watson's fingerprints.[6] L.C. averred that she had never met Watson or given him permission to enter her residence or take her property.[7]

On cross-examination, L.C. stated that there was a different lockbox containing a spare key secured to the railing outside her front door. She admitted that her ex-boyfriend Aaron Walker possibly knew the code to that lockbox. L.C. last had contact with Walker in 2019. L.C. also identified a broken picture frame on the bedroom floor that held a picture of her and Walker. When she left her residence, this frame was in a storage cube in her guest bedroom. She also testified that a page from her journal in which she had expressed unhappiness with her relationship with Walker had been ripped out and thrown on the floor.

At the close of the Commonwealth's case, Watson moved to strike the evidence, arguing in part that the fingerprint on the lockbox was insufficient to prove that he was the burglar. He also contended that the Commonwealth failed to prove beyond a reasonable doubt that the value of the

---

[5] L.C. did not describe what had been in the lockbox when she left her residence on October 20, 2022.

[6] The comparison of the remaining prints from the lockbox to Watson's prints was inconclusive.

[7] At the end of its case, the Commonwealth adduced a certified copy of a 2005 order sentencing Watson to 15 years of incarceration. The Commonwealth offered this document for the limited purpose of establishing that Watson was incarcerated in 2012, when L.C. purchased the lockbox.

stolen goods was $1000 or greater, as required to convict him of grand larceny under Code
§ 18.2-95(A)(ii). The circuit court denied the motion and subsequently convicted Watson of both
offenses.

At the sentencing hearing, the circuit court stated that it had reviewed the presentence report
(PSR). The discretionary sentencing guidelines yielded a range of four years and five months to
seven years and nine months, with a midpoint of five years and four months. Watson's wife,
Dr. Sherri Watson, testified that she had known Watson for more than 20 years and that they had
been married for 5 years.[8] She stated that Watson experienced childhood trauma related to his
mother's alcoholism.

Dr. Watson testified that her husband struggled with cocaine addiction and was angry and
frustrated when he used drugs. But Dr. Watson described her husband as a good person and man of
God who had obtained associate and bachelor's degrees in theology and was pursuing a master's
degree. Since his arrest in this case, she could hear a difference in how he perceived things when
they spoke on the phone. Dr. Watson concluded that her husband needed rehabilitation and to learn
to take responsibility for his actions.

Defense counsel also proffered a letter of support from Watson's pastor and documents
showing that Watson had completed multiple educational courses while incarcerated. Counsel
proffered that Watson first used cocaine in 1989 and asserted that his addiction likely fueled these
crimes. Watson recently had been accepted into a drug rehabilitation program.

Counsel further proffered that Watson served 3 prison sentences, most recently a 16-year
term ending in 2020. He stayed clean for 18 months after his release from that sentence but then
relapsed and fell deeper and deeper into addiction. He finally realized that he needed to address his
underlying mental health issues; he decided to see a therapist and attend Narcotics Anonymous and

---

[8] Dr. Watson explained that she had a doctorate in Christian counseling.

Alcoholics Anonymous meetings. He also got rid of all his "old drug contacts and associates." Watson acknowledged that he would "have to do some time on this" but wanted to get his drug addiction under control so he could move on with his life.

The Commonwealth responded that Watson's lengthy criminal history demonstrated that he was not amenable to rehabilitation. It noted that all of Watson's previous convictions were for "victim" crimes rather than for drug offenses. Submitting the length of the sentence to the circuit court, the Commonwealth noted that, if Watson's previous 16-year sentence was not a wake-up call, a sentence at the high end of the guidelines in this case would be likewise insufficient to get his attention.

Watson then personally addressed the circuit court, stating that he did not remember committing the offenses and asking the court for mercy. The circuit court noted that Watson's criminal history dated to 1988 and that his previous terms of incarceration apparently had no impact on him. The court also emphasized the "outrageous" nature of what Watson did to L.C.'s residence. Thus, the circuit court determined that an upward departure from the discretionary sentencing guidelines was appropriate. Accordingly, the circuit court sentenced Watson to a total of 40 years of incarceration, with 30 years of that time suspended.

Watson now appeals, asserting that the Commonwealth failed to prove his identity as the burglar. He also argues that the Commonwealth failed to establish that the value of the stolen goods was $1000 or more. Finally, he contends that the circuit court abused its sentencing discretion.

ANALYSIS

I. Sufficiency of the evidence

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The

judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

A. Burglary

As relevant here, a person who "in the nighttime enters without breaking or in the daytime breaks and enters" a dwelling house with the intent to commit larceny is guilty of statutory burglary. Code §§ 18.2-90, -91. Watson does not challenge any of the elements of burglary; rather, he argues that the Commonwealth failed to prove that he was the burglar. As with all criminal offenses, "the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013)). In determining whether the Commonwealth has proved identity beyond a reasonable doubt, "[c]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude

every reasonable hypothesis except that of guilt." *Sarka v. Commonwealth*, 73 Va. App. 56, 67 (2021) (alteration in original) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983))

"Properly understood, the reasonable-hypothesis principle is not a discrete rule unto itself." *Fary v. Commonwealth*, 77 Va. App. 331, 343 (2023) (en banc) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 249 (2016)), *aff'd*, 303 Va. 1 (2024). Rather, the requirement "that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." *Id.* at 344 (quoting *Vasquez*, 291 Va. at 249-50). The reasonableness of an alternative hypothesis of innocence "is a question of fact;" thus, the factfinder's determination "is binding on appeal unless plainly wrong." *Id.* (quoting *Lucas v. Commonwealth*, 75 Va. App. 334, 348 (2022)).

The Commonwealth's evidence proved that a fingerprint found on the lockbox in L.C.'s apartment matched Watson's fingerprints. Watson's "print was on an object which was stored in the bedroom of a private home, a place not accessible to the public in general or the defendant in particular, and a place where the defendant had no right to be." *Ricks v. Commonwealth*, 218 Va. 523, 526-27 (1977).

Watson offers no explanation for how his fingerprint got on the lockbox if he was not the burglar. Moreover, no evidence in the record would support such an explanation. L.C. purchased the lockbox in 2012, while Watson was incarcerated. L.C. had never seen Watson before, and the lockbox was inside her residence, to which he had no lawful access. In the absence of any plausible alternative explanation, the factfinder was entitled to conclude that the presence of Watson's fingerprints on the lockbox proved that he was the burglar in light of all the evidence.

Rather than offering an innocent explanation for the presence of his fingerprint on L.C.'s lockbox, Watson posits that Walker was the burglar. But there was no evidence—direct or circumstantial—that Walker was in the apartment in October 2022. L.C. had no contact with Walker for more than two years before the burglary. Thus, Watson's theory rested on the fact that Walker may have had access to L.C.'s spare key, and the fact that a picture of him and L.C. and a page from her journal referencing him were on the bedroom floor after the break-in.

We conclude that these considerations did not require the circuit court, acting as factfinder, to credit Watson's hypothesis of innocence. L.C. testified that she may have left her balcony door unlocked when she left on October 20, 2022. She also stated that, while she believed she locked her front door, she could not be certain that she did. Thus, the factfinder could find that the absence of forced entry was entirely consistent with Watson's guilt.

Watson asserts that "[t]he broken frame and the ripped page from the journal seem to show that this was personal." Although a trier of fact could consider this argument, it also could consider that L.C.'s whole apartment was ransacked and "[p]retty much everything" was out of place. Thus, the factfinder was not required to attribute a personal motive based on two specific items in the turmoil the burglar left when the totality of the scene just as easily pointed to an opportunistic stranger marauding for valuables.

Finally, as noted above, Watson's alternative hypothesis would require the factfinder to greatly diminish, if not outright ignore, the fingerprint evidence. But the circuit court was not required to do so, and we may not do so on appeal. The fingerprint evidence, viewed in the light most favorable to the Commonwealth, creates a robust chain of inferences leading to the conclusion that Watson entered L.C.'s apartment and stole her property while she was away. The factfinder was not required to set those conclusions aside in favor of Watson's conjecture

that an ex-boyfriend that L.C. had not seen in several years committed the offenses. *See Fary*, 77 Va. App. at 344. Accordingly, the evidence was sufficient to prove Watson was the burglar.

B. Grand larceny

A person who "commits simple larceny not from the person of another of goods and chattels of the value of $1,000 or more" is guilty of grand larceny. Code § 18.2-95(A)(ii). "The value of the goods is an element of the crime that the Commonwealth must prove beyond a reasonable doubt." *Burton v. Commonwealth*, 58 Va. App. 274, 283 (2011). "[T]he value of stolen property is measured at the time of the theft." *Baylor v. Commonwealth*, 55 Va. App. 82, 87 (2009) (quoting *Parker v. Commonwealth*, 254 Va. 118, 121 (1997)).

To determine the value of stolen goods, one looks at the fair market value, defined as "the price property will bring when offered for sale by a seller who desires but is not obliged to sell and bought by a buyer under no necessity of purchasing." *Little v. Commonwealth*, 59 Va. App. 725, 731 (2012) (quoting *Robinson v. Commonwealth*, 258 Va. 3, 5-6 (1999)). The item's original purchase price "is admissible as evidence of its current value." *Id.* (quoting *Robinson*, 258 Va. at 6). But "there must also be 'due allowance for elements of depreciation'" to avoid misleading the trier of fact "to believe that original price equals current value." *Id.* (quoting *Dunn v. Commonwealth*, 222 Va. 704, 705 (1981)).

"In Virginia, '[i]t is generally recognized that the opinion testimony of the owner of property, because of [her] relationship as owner, is competent and admissible on the question of the value of such property, regardless of [her] knowledge of property values.'" *Otey v. Commonwealth*, 71 Va. App. 792, 800 (2020) (first alteration in original) (quoting *King v. King*, 40 Va. App. 200, 212 (2003)); *see Burton*, 58 Va. App. at 280. The owner is "deemed qualified by reason of [her] relationship as owner to give estimates of the value of what [s]he owns." *Otey*, 71 Va. App at 801 (quoting *King*, 40 Va. App. at 212).

L.C. testified, without objection, regarding the value of the items stolen from her residence. She opined that her 55-inch television, which was worth $600 to $700 dollars when she received it 6 years earlier, was now worth $400. She estimated that the 32-inch television was worth $100.

Further, L.C. testified that the pearl necklace her grandmother gave her 10 years earlier was worth $200. Watson also stole 15 other necklaces worth a combined $50. Finally, L.C. lost a Michael Kors bag and 2 smaller Coach purses that she averred were worth a total of $400.

Under longstanding Virginia law, L.C. was competent to give lay testimony regarding the value of her property. *See id.* at 800. Although Watson contends that her testimony appeared arbitrary, it was the province of the circuit court as factfinder to weigh the probative value of her assessment of her property's value. On appeal, this Court must view L.C.'s testimony in the light most favorable to the Commonwealth. *See Clanton*, 53 Va. App. at 564. So viewed, it established that the property that Watson stole from her residence between October 20 and 23, 2022, was worth a total of $1,150. Accordingly, the Commonwealth's evidence was sufficient to establish that the value of the stolen goods was $1,000 or greater.

II. Sentence

"We review the trial court's sentence for abuse of discretion." *Scott v. Commonwealth*, 58 Va. App. 35, 46 (2011). "[W]hen a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564-65 (2016) (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)). "[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Thomason v. Commonwealth*, 69 Va. App. 89, 99 (2018) (quoting *Minh Duy Du*, 292 Va. at 565). Here, Watson's sentences were within the sentencing range set by the legislature. *See* Code §§ 18.2-91, -95(A)(ii).

Accordingly, it was within the circuit court's purview to weigh the mitigating circumstances in this case. *Keselica v. Commonwealth*, 34 Va. App. 31, 36 (2000). "Criminal sentencing decisions are among the most difficult judgment calls trial judges face." *Minh Duy Du*, 292 Va. at 563. "Because this task is so difficult, it must rest heavily on judges closest to the facts of the case—those hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *Id.*

The record belies Watson's assertion that the circuit court did not consider his mitigation evidence. The circuit court reviewed the PSR and the discretionary sentencing guidelines; it then heard Dr. Watson's testimony, the parties' arguments, and Watson's allocution. After receiving all this information, the circuit court concluded that Watson's lengthy criminal history, including several substantial prison sentences, had not motivated him to cease his criminal behavior. The circuit court also emphasized the outrageous and extremely personal nature of the offenses that Watson committed against L.C. and her residence. Given these considerations, the circuit court concluded that an upward departure was warranted and imposed a ten-year active sentence.

The fact that Watson disagrees with how the circuit court weighed the aggravating and mitigating factors does not amount to an abuse of discretion. The responsibility to balance those factors rests with the circuit court, not this Court. The circuit court properly heard and considered all the evidence and fashioned a sentence within the statutory maximums set by the General Assembly. There is no basis for this Court to disturb the circuit court's determination of sentence.

CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment.

*Affirmed.*